IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

**SALVATORE M. BOMBARDIERE, SR.,**

    Plaintiff,

v.                                                         **CIVIL ACTION NO.  1:11-CV-50**
                                                                              **(BAILEY)**

**SCHLUMBERGER TECHNOLOGY CORPORATION,**
*a Texas Corporation*, and
**SOS STAFFING SERVICES, INC.,**
*a Texas Corporation*,

    Defendants.

## ORDER RULING ON MOTIONS

Pending before this Court are, *inter alia*, Defendants' Motion *in Limine* to Exclude the Report and Testimony of Richard Lipsey, PH.D. (Docs. 216 & 221), Defendants' Motion *in Limine* to Preclude Evidence of Plaintiff's Alleged Exposure to Corrosion Inhibitor A261 (Docs. 217 & 223), Defendants' Motion *in Limine* to Preclude Evidence that Plaintiff Should Be Medically Monitored for Life and Motion to Strike Prayer for Medical Monitoring Costs (Doc. 218), Defendant's *Motion in Limine* No. 2, Motion of Defendant, SOS Staffing Services, Inc., to Preclude All Evidence that Plaintiff Should be Medically Monitored for Life and Motion to Strike Prayer for Medical Monitoring Costs (Doc. 213) and Defendant's *Motion in Limine* No. 3, Motion of Defendant, SOS Staffing Services, Inc. Regarding Plaintiff's Alleged Exposure to Corrosion Inhibitor A261 (also Doc. 213).  All Motions have been fully briefed.  In addition, on February 4, 2013, this Court held a ***Daubert*** hearing concerning the testimony and report of Dr. Lipsey.

1

I.      **Motions to Exclude Dr. Lipsey**

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

The rules applicable to determining whether expert testimony should be admitted are set forth in ***Westberry v. Gislaved Gummi AB***, 178 F.3d 257 (4th Cir. 1999):

> Expert testimony is admissible under Rule 702, then, if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue. *See **Daubert v. Merrell Dow Pharms., Inc.,*** 509 U.S. 579, 592 (1993). The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable - that is, whether it is supported by adequate validation to render it trustworthy. *See **id***. at 590 & n. 9. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue. *See **id***. at 591-92. Thus, an expert's

testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant." ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137 (1999) (internal quotation marks omitted).

A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant. See *id.* at 1174. The inquiry to be undertaken by the district court is "a flexible one" focusing on the "principles and methodology" employed by the expert, not on the conclusions reached. ***Daubert***, 509 U.S. at 594-95. In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved. See ***Kumho Tire Co.***, 119 S.Ct. at 1175-76 (footnote omitted). The court, however, should be conscious of two guiding, and sometimes competing, principles. On the one hand, the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. See ***Cavallo v. Star Enter.***, 100 F.3d 1150, 1158-59 (4th Cir. 1996). And, the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. See *id.* As with all other admissible evidence, expert testimony is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." ***Daubert***, 509 U.S. at 596. On

the other hand, the court must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to "be both powerful and quite misleading." *Id.* at 595 (internal quotation marks omitted). And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded. See **United States v. Dorsey,** 45 F.3d 809, 815-16 (4th Cir. 1995).

178 F.3d at 260-61.

The first issue which must be addressed is whether Dr. Lipsey is "qualified as an expert by knowledge, skill, experience, training, or education" to render the opinions which he has proffered. "Under Rule 702, to be 'qualified' as an expert, a witness must have 'knowledge, skill, experience, training, or education' in the subject area in which he intends to testify. Fed.R.Evid. 702. An expert's qualification depends on 'the nature of the opinion he offers.' See **Gladhill v. Gen. Motors Corp.,** 743 F.2d 1049, 1052 (4th Cir. 1984)." **Foster v. Legal Sea Foods, Inc.**, 2008 WL 2945561 (D. Md. July 25, 2008).

This Court has serious reservations concerning Dr. Lipsey's qualifications and his apparent tendency to overstate those qualifications. While in his report (Doc. 221-2, p. 103), Dr. Lipsey states that he has a Ph.D. from the University of Illinois in toxicology, in fact his Ph.D. is in entomology. While he claims that Illinois did not have a toxicology department and that his degree is actually in toxicology, his doctoral program transcript discloses that he did not take a single course in toxicology. (Doc. 269-2, p. 13). He states that he took one course in his master's degree program that was titled toxicology.

This Court also notes a progression in his curriculum vita ("CV"). Dr. Lipsey's CV from 1976 states that he obtained a Ph.D. in 1972 "in entomology with a minor in botany (plant ecology)." (Doc. 221-3, p. 23).

His CV from 1988, states that he obtained a Ph.D. in Environmental Toxicology/Entomology (Doc. 221-3, p. 27). In 1990, Dr. Lipsey's CV also lists a Ph.D. in Environmental Toxicology/Entomology (Doc. 221-3, p. 35). His 1996 CV lists a Ph.D. in Toxicology (Doc. 221-3, p. 39). His 2012 CV lists a Ph.D. in Toxicology Fungicide poisoning (Entomology Department) (Doc. 221-3, p. 18). At the ***Daubert*** hearing, his doctorate was in "fungicide toxicology."

A review of his current CV discloses that most of Dr. Lipsey's work has involved pesticides, fungicides, and herbicides.

In his report in this case, Dr. Lipsey states that "I have been testifying as an expert witness in state and federal courts nationwide since 1976 and have always passed ***Daubert*** and ***Frye*** hearings as an expert, when present at the hearings, and always giving (*sic*) solid scientific opinions based of (*sic*) good science." (Doc. 221-2, p. 103). This is misleading, since he has been excluded on ***Daubert*** grounds on several occasions. Apparently, the phrase "when present at the hearings" was added in response to the Judge Simon's opinion in ***Aurand v. Norfolk & Southern Railway Co.***, 802 F.Supp.2d 950 (N.D. Ind. 2011). In ***Aurand***, the Court stated:

> Dr. Lipsey sets out the basis for his claimed expertise in his report. It notes, among other things, that he has a Ph.D. in toxicology, that he was a professor of toxicology, that he consulted in toxicology for the EPA and the

Department of Agriculture, and that he is a member of the Society of Toxicology and the American College of Toxicology. DE 71–2, p. 2. Norfolk Southern raises some legitimate questions concerning Dr. Lipsey's qualifications and expertise as a toxicologist. DE 71, p. 22. But more troubling is Dr. Lipsey's claim that he has been acting as an expert witness since 1976 and has "always passed *Daubert* and *Frye* hearings as an expert with solid scientific opinions based of (sic) good science." Lipsey's Report of August 19, 2009, DE 71-2, p. 2. But this simply isn't so. Norfolk Southern points me to four instances where Dr. Lipsey's opinion testimony has been rejected, and the plaintiffs make no reply to these assertions. DE 71, pp. 23-24. And most glaringly, while rejecting Dr. Lipsey as an expert witness, one district judge in Florida excoriated him:

> [T]his is the worst example that I have seen in my 15 years experience in the courts as a judge demonstrating what's wrong with expert testimony in our courts of law. It's obvious you can get a Ph.D. to say anything, and this one is prepared to say anything, gratuitous or otherwise ... It's just sheerly his opinion - and I do put that in quotes because, in my opinion, it's absolutely pure and simple, unadulterated speculation, guesswork, just blown-in. There's no scientific basis for any opinion that he has rendered, and I would consider him to be a false expert; and, therefore he will not be permitted in this court, unless the Eleventh Circuit directs otherwise.

> *Williams v. Orkin Exterminating Co.*, Cause No. 3:95CV30511-LC, DE 275, pp. 55-56.

802 F.Supp.2d at 954.

Similarly, in *Hatton v. CSX Transp., Inc.*, 2004 WL 1459391 (Tenn. Ct.App. June 29, 2004), the Court stated:

> The testimony of a proffered witness for the Plaintiff, Dr. Richard Lipsey, was excluded on a motion in limine. Dr. Lipsey "was to be the Plaintiff's expert witness on toxicology."
>
> According to his brief, Plaintiff intended to call Dr. Lipsey to testify concerning the human health effects and toxicology concerning exposure to the organic solvents in this case, and the scientific literature concerning low dose exposure to these solvents causing brain damage in humans and CSXT's knowledge of the same.
>
> He has a masters in entomology, the study of insects and how to kill them with pesticides, from the University of Arkansas in 1968. He earned his Ph.D. in 1971 from the University of Illinois, in the discipline of toxicology. The discipline of toxicology, includes the adverse effects of the chemicals and solvents used in pesticides on humans and non-target animals, such as birds and fish.
>
> After he obtained his Ph.D., Dr. Lipsey worked in private industry, for the company now known as Bayer Chemical, assessing the benefits and risks of new pesticides, herbicides, insecticides, fungicides and rodenticides.

7

> Dr. Lipsey spent four years as a consultant to the EPA, USDA and the U.S. State Department concerning pesticide environmental hazards. He has been involved in consulting since 1986.
>
> Dr. Lipsey is a member of the American College of Toxicology and is a peer reviewer for them. He is a member of the Society of Toxicology. He is affiliated with a number of other professional organizations in toxicology. He taught classes in toxicology for five years at the University of Florida as a professor, and currently teaches an OSHA certification course at the University of Florida as an adjunct professor.
>
> . . .
>
> His discovery deposition reveals that he has no degree in toxicology, and that he took only one toxicology class in his entire career, and has no specialized knowledge of toxicology. Oddly enough, he admitted that his "expert opinion" really did not require expert testimony, because he proposed to offer opinions that the Plaintiff worked for the Defendant using chlorinated solvents, that the solvents were volatile, that the Plaintiff was exposed to these solvents on a regular basis, and that the symptoms the Plaintiff developed "are consistent with a chronic exposure to the petroleum products, especially TCA."

2004 WL 1459391 at *14-15.

In a footnote, the Court added that "[a]pparently Dr. Lipsey was not well prepared. TCA [trichloroethane] is not petroleum based." *Id.*, at *15.

See also **Versluis v. Gulf Coast Transit Co.**, 17 So.3d 459 (La.App. 4 Cir. 2009)

and *Sosa v. Rockpointe Homeowners Assoc.*, 2008 WL 224368 (Cal.App. 2d Dist. January 29, 2008).

While it may seem to be nit-picking, this Court also questions Dr. Lipsey's suitability as an expert witnesses due to some of his statements. At the *Daubert* hearing, Dr. Lipsey stated that the ACGIH TLV limits was abbreviated for "tolerance limit value." In fact, this limit, which is of great importance in industrial exposure cases, is the "threshold limit value." In addition, in Dr. Lipsey's deposition, he stated that EZEFLO F108 Surfactant, was "another carcinogen, proprietary, so we don't know the ingredient but MSDS says it causes cancer." In fact, the MSDS for F108 states that it is "[n]ot known to cause cancer in humans." (Doc. 218-2, p. 30).

This Court also finds that Dr. Lipsey used a methodology that fails to meet the standard. He opines that due to exposure on February 12, 2010, the plaintiff was exposed to a number of chemicals when he had to hand carry buckets of the chemicals to the blender. The buckets had to be handed up to a man who poured them into the blender. The chemicals would spill on him and he would get wet with chemicals. On one occasion, a bucket was accidently dumped on him and he became saturated. The chemicals were stored under a tarp where fumes would build up. Even though he does not know the exact chemicals to which the plaintiff was exposed, the dose of the chemicals or the duration, Dr. Lipsey opines that the plaintiff suffers from chronic, if not permanent, health effects and will need medical monitoring for life.

The appropriate methodology for toxicologists in a case such as this, according to Judge Lee in *Roche v. Lincoln Property Co.*, 278 F.Supp.2d 744, 754 (E.D. Va. 2003),

is that described by Judge Ellis in *Cavallo v. Star Enterprise*, 892 F.Supp. 756, 765 (E.D. Va. 1995). This methodology, endorsed by the World Health Organization, the National Academy of Sciences, and various agencies of the United States Government, calls for the following "risk assessment":

> First, an evaluation is made of the chemicals to which the individual might have been exposed, and of the concentrations of these chemicals in air breathed by the individual. The second step involves an evaluation, based on the published scientific literature, of the exposures necessary to produce the adverse effects associated with the chemicals to which individuals may be exposed. These two evaluations are then combined in the final step of the risk assessment to provide an estimate of the likelihood that any of the harmful properties of any or all of the chemicals might have been expressed in the exposed individual.

892 F.Supp. at 765.

"[A]ll chemicals can cause health problems at some level or concentration of exposure, but they vary widely in the types of harm caused and in the levels of exposure required to trigger those harms. In addition, all chemicals have thresholds of exposure that must be exceeded before the harms will occur, and these thresholds may be identified through scientific studies and literature. The task of the toxicologist, therefore, is to identify a dose-response relationship for a particular chemical (or chemical mixture) and illness and analyze the results to determine whether the duration and concentration of exposure in a given instance could have caused the alleged harms." *Id*.

In *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999), the Fourth Circuit noted that:

> In order to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the "plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure.'" *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir. 1999) (quoting *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1106 (8th Cir. 1996)); see *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 199 (5th Cir. 1996) (concluding that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case"); cf. *Black v. Food Lion, Inc.,* 171 F.3d 308, 314 (5th Cir. 1999) (explaining that "[t]he underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur"). But, it must also be recognized that
>
>> [o]nly rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes. . .. Human exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals like lead or asbestos; however, even under these circumstances,

> it is usually difficult, if not impossible, to quantify the amount of exposure.

Federal Judicial Center, *Reference Manual on Scientific Evidence* 187 (1994). 178 F.3d at 263-64.

While in ***Westberry***, the Court determined that substantial exposure could be demonstrated by plaintiff's testimony, the same does not apply here. The plaintiff does not know to what chemicals he was exposed nor in what amounts.

Furthermore, in ***Westberry***, the expert witness utilized a differential diagnosis to determine causation.[1]

In this case, differential diagnosis is not availing, since Dr. Lipsey recommends medical monitoring for cancer, nasopharyngal cancer, leukemia and central nervous system damage. The symptoms of these medical problems are not present.

This Court further finds that Dr. Lipsey's methodology is improper based upon the use of unwarranted and unsupported assumptions. First, Dr. Lipsey does not know the chemicals to which the plaintiff was exposed. He bases his exposure diagnosis solely on the MSDS sheets that the plaintiff was given.

Second, Dr. Lipsey stated that A261 was "the major component in the fracking," (Doc. 221-2, p. 80), and from that assumption extrapolates that the plaintiff received a "significant dose." Fracking at the well site occurred from February 8 to February 13, but

---

[1] "As the Fourth Circuit has explained, differential diagnosis 'is a standard scientific technique of identifying the cause of a medical problem ... by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.' ***Hines v. Wyeth***, 2011 WL 2680718, *4 (S.D. W.Va. July 8, 2011) (Copenhaver, J.) (quoting ***Westberry***, *supra* at 262).

it was only on February 12 and 13 that chemicals were carried in buckets due to the pumps having frozen. During the entire period of fracking, Schlumberger used 4 gallons of A261 of a total of 4,728 gallons of chemicals. Accordingly, A261 represented less than 1/1,000 of the chemicals used in the fracking process at the site. Furthermore, the component of A261 to which Dr. Lipsey assigns the need for monitoring is formaldehyde which represents 1% to 5% of A261.

Finally, the MSDS sheets for the chemicals at the site list the potential for cancers, leukemia and CNS problems with **chronic** exposure. At the *Daubert* hearing, the following testimony was elicited:

> Q. What is the difference between acute and chronic exposure?
>
> A. Acute exposure is a short duration and chronic exposure is of a longer duration. NIOSH says chronic is a year or more, but most toxicologist don't use that.
>
> Q. What is NIOSH?
>
> A. NIOSH, National Institute for Occupational Safety and Health.
>
> Q. So according to the National Institute for Occupational Safety and Health, if a person is exposed to silica for less than a year, NIOSH would not classify that as chronic exposure, correct?
>
> A. That's correct.
>
> Q. And Mr. Bombardiere's exposure was 16 days; is that right?
>
> A. Yes.
>
> Q. Therefore to the extent he had any exposure, it was acute, correct?
>
> A. Acute to intermediate.

> Q. What is intermediate exposure?
>
> A. Intermediate is halfway between acute and chronic.

Actually, the fracking at the site took place over six days, and it was only on two days that the pumps froze and the workers used buckets to transport chemicals. Dr. Lipsey has presented no support for his contention that two days' exposure, or even six days, constitutes chronic exposure.

Finally, Dr. Lipsey's assumptions are contradicted by another plaintiff's expert, Dr. Charles L. Werntz, who stated in a deposition that (1) it is possible that the exposure to any of the chemicals was below recommended levels or permitted levels (Doc. 218-2, p. 109), (2) a few days' exposure would seem less likely to cause silicosis, which is a chronic disease (Id., p. 110), and (3) he does not believe that there is any specific cancer that the plaintiff is at risk for (Id., p. 126).

Based upon all of the foregoing this Court finds that Dr. Lipsey lacks the qualifications to render the opinions for which he has been retained, has deviated from the appropriate methodology to render such opinions without providing any justification or support therefor, and has based his opinions on assumptions that are simply not supported by the record. Accordingly, this Court will exclude the testimony and report of Dr. Lipsey.

## II. Motion to Strike Claim for Medical Monitoring

The defendants in this case have also moved to strike the plaintiff's claim for medical monitoring. Under Pennsylvania law,[2] the standard for medical monitoring is provided by **Redland Soccer Club, Inc. v. Dept. of the Army**, 548 Pa. 178, 696 A.2d 137 (1997).

---

[2] The parties agree that the issue of medical monitoring is governed by Pennsylvania law.

14

"According to *Redland Soccer,* a plaintiff must establish the following seven elements in order to succeed on a medical monitoring claim:

1. Exposure greater than normal background levels;

2. To a proven hazardous substance;

3. Caused by the Defendant's negligence;

4. As a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;

5. A monitoring procedure exists that makes early detection of the disease possible;

6. The prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

7. The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles."

*Fiorentino v. Cabot Oil & Gas Corp.*, 2011 WL 5239068, *3 (M.D. Pa. November 1, 2011) (citing *Redland Soccer*, 548 Pa. at 195-96, 696 A.2d at 145-46). See also *Sheridan v. NGK Metals Corp.*, 614 F.Supp.2d 536 (E.D. Pa. 2008).

Proof of the above elements requires expert testimony. *Redland Soccer*, 548 Pa. at 196, 696 A.2d at 146.

In this case, the Court must focus upon the fourth criterium, requiring a significantly increased risk of contracting a serious latent disease. In the absence of Dr. Lipsey, the plaintiff's case rests upon Dr. Werntz, who has stated that (1) it is possible that the exposure to any of the chemicals was below recommended levels or permitted levels (Doc. 218-2, p. 109), (2) a few days' exposure would seem less likely to cause silicosis, which

is a chronic disease (Id., p. 110), and (3) he does not believe that there is any specific cancer that the plaintiff is at risk for (Id., p. 126).

Although plaintiff alleges that he was exposed to silica dust, neither he nor his experts offer competent expert evidence that he was exposed to silica dust and other fracking materials at levels and at durations known in the medical literature to be associated with silicosis, lung cancer or any other conditions. Dr. Werntz offers no opinion in connection with the level or duration of plaintiff's exposure to silica dust, while Dr. Lipsey, admits that no air samples were ever taken or analyzed and that the only evidence he can point to is plaintiff's testimony that he was breathing unknown quantities of silica dust for an unknown period of time. (Doc. 247-2, pp. 23-24) ("I believe that he was exposed to airborne silica. I don't know how many times. But since silica is a major component in hydraulic fracturing, I assume he was exposed every day to silica. I can't prove that. But if I get a chance to talk to him, which I hopefully will between now and trial, I'll tell you how often he was exposed.").

Plaintiff argues that there is a "reasonable probability" that he was exposed to the chemicals identified on the Material Safety Data Sheets ("MSDSs") provided to plaintiff by Schlumberger. The argument that simply because plaintiff was exposed, he is at significant risk has been rejected by the Pennsylvania courts. *See* **Sheridan**, 614 F.Supp.2d at 547. Plaintiff's experts formed their opinions without knowing any information concerning the concentrations of the chemicals that had allegedly made contact with plaintiff, the dosage allegedly absorbed by plaintiff, the duration of such exposure, or the nature and intensity of plaintiff's exposure. Their opinions are not scientifically relevant to the issue of medical monitoring.

Accordingly, this Court will exclude any evidence of or argument for medical monitoring and will strike the claim from the case.

### III. Motion to Exclude Evidence of Alleged Exposure to Corrosion Inhibitor A261

In this Motion, the defendants seek to exclude testimony, documentary evidence and reference in opening statement to the following:

1. That the plaintiff, Salvatore Bombardiere, Sr. ("Plaintiff") was "exposed to" the chemical product Corrosion Inhibitor A261 ("A261") while working at the subject natural gas drilling sites;

2. That plaintiff suffered any injury as a result of alleged "exposure to" A261; and

3. That plaintiff is at increased risk of any illness as a result of his alleged "exposure to" A261.

Based upon this Court's ruling above, the third listed item, that of increased risk of illness will be granted. The other two items will be denied.

There is no dispute that the plaintiff was exposed to fracking chemicals while working at the Waynesburg well site. There is also no dispute that the A261 was one of the chemicals used in fracking. There appears to be no dispute that the A261 was kept beneath the tarp at the job site, from which the workers obtained their chemicals. Therefore, a jury may fairly infer that the plaintiff was exposed to some amount of A261.

There is also no dispute that A261 is corrosive and may rapidly cause pain, burns, redness, swelling and damage to tissue in an acute skin contact. It may also cause illness in an acute skin exposure. (Doc. 218-2, p. 13).

There is also no dispute that Dr. Michelle Lilly diagnosed the plaintiff with "chemical burns, bilat[eral] hands."

17

This Court finds that based upon the above, the remainder of the Motion should be denied.

## IV. Conclusion

Based upon the foregoing:

A. Defendants' Motion *in Limine* to Exclude the Report and Testimony of Richard Lipsey, PH.D. (Docs. 216 & 221) is **GRANTED**;

B Defendants' Motion *in Limine* to Preclude Evidence of Plaintiff's Alleged Exposure to Corrosion Inhibitor A261 (Docs. 217 & 223) is **GRANTED IN PART AND DENIED IN PART**, consistent with this opinion;

C. Defendants' Motion *in Limine* to Preclude Evidence that Plaintiff Should Be Medically Monitored for Life and Motion to Strike Prayer for Medical Monitoring Costs (Doc. 218) is **GRANTED**;

D. Defendant's *Motion in Limine* No. 2, Motion of Defendant, SOS Staffing Services, Inc., to Preclude All Evidence that Plaintiff Should be Medically Monitored for Life and Motion to Strike Prayer for Medical Monitoring Costs (Doc. 213) is **GRANTED**; and

E. Defendant's *Motion in Limine* No. 3, Motion of Defendant, SOS Staffing Services, Inc. Regarding Plaintiff's Alleged Exposure to Corrosion Inhibitor A261 (also Doc. 213) is **GRANTED IN PART AND DENIED IN PART**, consistent with this opinion.

It is **SO ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: February 13, 2013.

/s/ John Preston Bailey
JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE